NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

JOSE H., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, J.M., E.M., *Appellees.*

No. 1 CA-JV 19-0308
FILED 3-23-2020

---

Appeal from the Superior Court in Maricopa County
No. JD34421
The Honorable David O. Cunanan, Judge

**AFFIRMED**

---

COUNSEL

Denise L. Carroll Esq., Scottsdale
By Denise L. Carroll
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Autumn Spritzer
*Counsel for Appellee, Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Vice Chief Judge Kent E. Cattani joined.

---

**C A M P B E L L**, Judge:

¶1        Jose H. ("Father") appeals the superior court's order severing his parental rights to J.M. (born in 2013) and E.M. (born in 2015) (collectively "the Children"), based on the statutory ground of abandonment.[1] For reasons that follow, we affirm.

## BACKGROUND

¶2        Mother and Father separated in 2016 when the boys were one and four years old. Sometime between January and May 2017, Father was arrested and charged with felony DUI for driving while under the influence of alcohol and cocaine. Father had both Children in the car, and neither were in car seats. Father was arrested and put in jail.

¶3        On June 12, 2017, while Father was still in custody, Mother was arrested for driving under the influence, similarly with the Children in the car. Mother was unable to tell the Department of Child Safety ("DCS") where Father was, and no other family members were available to care for the Children, so DCS took temporary custody of the Children.

¶4        DCS eventually found Father in jail in Maricopa County in July 2017. DCS filed a dependency petition three days later alleging, as is relevant here, that "Father is unable to provide proper and effective parental care due to incarceration." At the dependency hearing, Father was appointed counsel and did not contest the allegations in the petition. The court declared the Children dependent in September 2017.

¶5        DCS asked Father to participate in services while in custody and told him to maintain contact with DCS when he was released. Father was released from jail in January 2018, but did not contact DCS or his attorney. Thereafter, Father was deported to Mexico. Father also failed to

---

[1]        Mother's parental rights to the Children were severed in an earlier proceeding, and she is not a party to this appeal.

remain in contact with his Children. He testified that he sent Christmas cards to the Children, albeit in February, but beyond that, did not send any cards, letters, or gifts, or provide any financial or emotional support of any kind.

¶6          Father testified that after he got out of jail, he would video chat with the Children when they visited Mother. In May of 2018, DCS discovered that Mother had contact with Father, and asked her to give the case manager his number. DCS called the number and left a voicemail but Father did not return the call.

¶7          In July 2018, DCS filed a motion to sever Father's parental rights pursuant to the statutory grounds of abandonment and nine-months time in care. Father's whereabouts were still unknown, necessitating service by publication.

¶8          The next time Father contacted DCS was in November 2018. He informed DCS he wanted to reestablish custody of his Children. The case manager advised Father to seek out services through Integral Family Development ("DIF") in Mexico. Father participated in DIF services, including parenting classes, a psychological evaluation, a rule-out urinalysis test, and he cooperated with a home study of his parents' house. The psychologist had no concerns regarding Father's mental health, Father's drug test came back negative, and DIF approved Father's housing.

¶9          Based on this information, DCS authorized video calls between Father and the Children. At first, one child refused to speak to Father because the child was "scared and not ready," but he eventually consented to video contact. The Children do not speak Spanish, and Father knows very minimal English, so a translator was needed for the entirety of each conversation. Although Father had found a "Spanish/English school" for the Children to attend in Mexico, he insisted that he did not need a translator to communicate with the Children, because he could "kind of understand" them without one, and they were young enough to learn Spanish. Considering the language barrier and the Children's inability to sit still, the case manager testified she did not believe these phone calls were sufficient to establish a normal parent-child relationship.

¶10          The court held a one-day contested severance trial in August 2019. By that time, the Children had spent over two years in care. The boys had developed strong bonds with their placement family. The placement family also sought out and took in the Children's older sister, who was in another placement, "so the siblings could be together." The Children have

now developed strong bonds with their sister. The family intends to adopt all three children.

¶11       At the conclusion of trial, the court found that Father abandoned the Children, and that termination was in the best interests of the Children. The court heard testimony that the Children's placement was willing to facilitate phone conversations between Father and the Children and encouraged the parties to include a written provision for continued contact in any proposed adoption orders. Father timely appealed.

**DISCUSSION**

¶12       Father argues insufficient evidence supports the court's abandonment finding. We disagree.

¶13       The right to custody of one's child is fundamental, but not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶ 12 (2000). The superior court may terminate parental rights if it finds clear and convincing evidence of one of the statutory grounds under A.R.S. § 8-533(B), and a preponderance of the evidence showing termination would be in the best interests of the children. *Id.* at 249, ¶ 12; *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005).

**I.       Abandonment**

¶14       At issue here, a statutory ground for termination arises when "the parent has abandoned the child." A.R.S. § 8-533(B)(1). Abandonment is defined in the statute as:

> . . . the failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. Abandonment includes a judicial finding that a parent has made only minimal efforts to support and communicate with the child. Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment.

A.R.S. § 8-531(1). No "bright line formula [has] developed to determine whether a parent abandoned an existing relationship." *Pima Cty. Juv. Sev. Action No. S-114487*, 179 Ariz. 86, 96 (1994).

¶15       The court found Father abandoned the Children. The record reflects that Father did not parent the Children between July 2017, when the

dependency proceedings began, and November 2018, when he first got in touch with DCS seeking renewed contact with the Children. This timeframe is well beyond the statutorily proscribed six-month period to establish a prima facie case of abandonment.

¶16       The superior court is entrusted with a great deal of discretion in weighing and balancing the interests of the children, parents, and state. *Cochise Cty. Juv. Action No. 5666–J*, 133 Ariz. 157, 160 (1982). As the trier of fact, the superior court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009) (internal quotation omitted). We will not disturb the court's termination of parental rights unless the factual findings are clearly erroneous—that is, unless no reasonable evidence exists to support them. *See Minh T. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 76, 78–79, ¶ 9 (App. 2001). This court interprets the evidence and reasonable inferences in the light most favorable to affirming the court's order. *Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 207, ¶ 2 (App. 2008).

¶17       Father argues that DCS could not prove a prima facie case of abandonment because he participated in requested services, which "indicated that Father was appropriate to parent." This argument ignores over a year and a half where Father had no contact with the Children and provided no financial or emotional support. While it is true that Father successfully participated in services, that engagement did not preclude a finding of abandonment.

¶18       Father was in custody from July 2017 until January 2018 and was then deported to Mexico. "[W]hen circumstances prevent the . . . father from exercising traditional methods of bonding with his child, he must act persistently to establish the relationship however possible and must vigorously assert his legal rights to the extent necessary." *Michael J.*, 196 Ariz. at 250, ¶ 22 (internal quotation omitted). Courts "should look to see whether the parent has taken steps to establish and strengthen the emotional bonds linking him or her with the child." *Kenneth B. v. Tina B.*, 226 Ariz. 33, 37, ¶ 21 (App. 2010).

¶19       Here, Father has not taken the requisite steps. DCS advised Father to send cards, gifts, and letters, and to make contact with the Children as early as July 2017. Besides one belated Christmas card to each child, Father did not have communication with the Children, did not send any letters or gifts, and did not provide basic support throughout the 19-month pendency of the case. In light of Father's failure to "maintain

regular contact" with the Children and to "provide reasonable support," Father did not "maintain a normal parental relationship" with the Children for 19 months.

**¶20** Although Father started communicating with the Children through video chat in 2019, the court heard evidence the video chat calls were too superficial to "establish or reestablish" a normal parental relationship, particularly because the language barrier between Father and the Children hindered communication. DCS opined that, other than the video calls, Father did not do anything that would remedy his prior abandonment of the Children, including his failure to provide any financial or emotional support of the children for 19 months.

**¶21** Therefore, reasonable evidence supported the court's finding that DCS presented a prima facie case demonstrating Father's abandonment of his Children.

## II. Best Interests of the Children

**¶22** To the extent Father challenges the court's best interests finding, the finding is supported in the record. In considering whether termination of parental rights is appropriate, the superior court must find termination is in the Children's best interests by a preponderance of the evidence. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 149–50, ¶ 8 (2018).

**¶23** Termination of parental rights is in the children's best interests if termination would benefit the children or if the continuation of the relationship would harm the children. *Aleise H. v. Dep't of Child Safety*, 245 Ariz. 569, 572, ¶ 9 (App. 2018) (internal citation omitted). Once the court's focus shifts to the best interests analysis, the "foremost concern . . . is protecting a child's interest in stability and security." *Id.* (internal quotations omitted). The superior court also considers whether the current placement is meeting the children's needs and whether the placement wants to adopt the children. *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 5 (App. 1998) (internal citations omitted).

**¶24** Here, evidence supports the court's finding that termination would benefit the Children. The Children have spent over two years in out-of-home care and have developed strong bonds with their placement family. The placement family has been "the only source of stability they've had in their life." The placement family intends to adopt the Children and their older sister.

**¶25** Evidence also supports the court's corollary finding that continuing the relationship would be harmful to the children. DCS agreed it would be "traumatic for the Children to be separated from the placement after the amount of time [the] boys have lived with her." It would also "be harmful to the boys if they were sent to Mexico [and] separated from their sister," because they are bonded.

**¶26** Reasonable evidence supports the court's finding that termination of the parental relationship is in the Children's best interests by a preponderance of the evidence.

## CONCLUSION

**¶27** For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:  AA